We'll hear argument next this morning, Case 13-1428, Davis v. Ayala. Ms. Urbanski. Mr. Chief Justice, and may it please the Court. The California Supreme Court's harmlessness determination was an adjudication on the merits because it denied relief on the basis of the intrinsic rights and wrongs of Mr. Ayala's claim. A Federal habeas court is authorized to set aside that final State judgment only if Ayala can show two things. First, a legal error as a matter of this Court's clearly established laws, and second, actual prejudice under Brecht. As to the first point, the Ninth Circuit took the view here that there was no adjudication on the merits, and it proceeded to review the entirety of Mr. Ayala's claim under the de Novus standard. Sotomayor Your brief confused me, and it took me a while to pull it apart. All right? I don't know that there's a dispute, or at least there's a dispute in the application. But really, the deference here was given to the harmless error finding, or purported to have been given. So there's no dispute that the court below committed an error, meaning that the court below didn't apply the right standard. It's a factual question. The issue, I think, that you're trying to arrive at is under the circumstances of this case that the court also reach the performance prong of Strickland. And that's really where the dispute is, isn't it? Well, the issue before the court was a Batson issue. It was whether the procedures employed by the trial court had, in fact, were the proper procedures in terms of excluding defense counsel. And the Ninth Circuit in this case took the view that there was no adjudication on the merits with respect to the State court's finding of harmlessness. And it proceeded to review the legal claim. De Novus. Kagan Mr. Bansky, let's say that the Ninth Circuit is wrong in that respect. Let's say there's an adjudication on the merits here, all right? But I think that that doesn't solve the basic problem of this case. There's an adjudication on the merits, but there are these two prongs. There's the harmlessness prong and then there's the substantive violation prong, whether a Batson violation occurred. And what the Court here said was if a Batson violation occurred, it doesn't matter, it would be harmless. So if you, for whatever reason, right or wrong, if you take that harmlessness determination out of the picture, if you say that that was an unreasonable application of law, all right, we're left with essentially a vacuum, right? And so what happens? What does the Court do where there's been no finding as to a Batson violation? And you're saying that it should kind of make up a reason why there might not have been a Batson violation and go with that. And why is that the proper approach? Your Honor, the reason why that is a proper approach is because on Federal habeas corpus, what the Federal court is doing is deferring to the State, the final State court judgment of conviction. Even in the case that Your Honor has presented, the State court has ultimately denied relief. It simply did so on harmless error grounds. Had the State court done precisely the same thing as a matter of a silent denial, that decision would have been entitled to deference. Scalia, why is the harmless error thing out of the picture? I don't really understand that. I mean, if, in fact, the State court found that whatever error there was, if there was any, was harmless, and if that's a merits determination, why do we even have to get to the point of whether there was a violation? The problem, Your Honor, that is correct, but the problem, Your Honor, is it leaves us with what the Ninth Circuit did here, which was to look at the underlying constitutional issue from a de novo perspective. That is not the proper start for a verdict. I'm saying you don't have to look at the underlying constitutional issue. Once there's been a determination that it's harmless, whether there was a violation or not, if there was one, it was harmless. Once there's been that determination, why do you have to investigate whether there was one or not? And that's correct, Your Honor. The harmlessness determination would resolve the claim based on its verdict. Well, you only do if the harmlessness determination is an unreasonable application under AEDPA. So if that is an unreasonable application, you face the quandary of what you do with respect to the substantive violation. It obviously doesn't arise if the harmlessness determination is perfectly fine. Correct, Your Honor. And don't you contend that it was fine? Yes, certainly in this case. So that ought to be the end of the case as far as you're concerned, right? In this case, that isn't an issue. However, in the case where the State court has left unresolved the issue of the underlying constitutional error, we still do have the problem for future cases of how are we going to review that aspect of the claim. The Ninth Circuit took the approach here that the proper standard review of the claim We don't review judgments. We don't review legal issues. I mean, you'd like us to answer that question, even though it's unnecessary to this case, right? Well, and I don't disagree with Your Honor that if the finding of harmlessness is a reasonable application of the Chapman standard in this case, then that certainly is the end of the inquiry. I am. If we were to find that it wasn't a reasonable finding, then we would have to reach the first issue. That's correct, Your Honor. Assume that it was unreasonable. Let's go back to the first issue. Yes, in Williams and Harrington, we have said that if there are multiple claims and the State court just says everything's denied, you assume that means Federal and State. If the State claim is the same as the Federal claim, we say they, they, they, we assume they meant the Federal claim as well. But this is sort of an interesting case, because the State, they said there was constitutional error under State law, but they studiously avoided Federal, saying there was one or not under Federal law, and they dismissed the Federal claim just on the harmlessness prowl. And what the Ninth Circuit said, as I understand, they didn't reach it. Constitutional avoidance made them decide that it was easier for them to just say there was State error. Why do we reach a different conclusion? That's correct, Your Honor. The State court here did not resolve the underlying constitutional aspect of the claim, and it proceeded to, to resolve the claim based on the harmless error grounds alone. That is an adjudication on the merits. What the Ninth Circuit could not do is precisely what it did in this case, which was out the gate, look to the underlying constitutional issue and simply resolve that based on what it would have done. Sotomayor, I'm sorry, why not? If the State court didn't reach the Federal constitutional error, you're asking us to assume it did when you've admitted it didn't? No, I'm not asking the Court to assume that it did. What I'm saying is that on Federal habeas corpus, the deference that is owed is to the final State court judgment. And in this case, the final State court judgment was a denial of relief. Well, suppose — I mean, that's a very broad kind of rationale. It would apply even if the State court said that there was a violation, right? Then you would say there's a violation, but no worries, it's harmless. And then you decide that the harmlessness issue is, is, is out because that's an unreasonable application. And then you're going to have a review in court say, notwithstanding that the State court found that there was a violation, we think that there's a credible argument that there wasn't such that we can support the judgment. Is that what you're asking? And that is correct. That is how the scenario would play out, Your Honor. And I recognize that that is a more — It's a little bit counterintuitive. A little more challenging case, for sure. However, again, what a Federal court is deferring to is the finality of the State court's judgment. And on Federal habeas, the question is whether the habeas Petitioner can meet his very high burden of showing both clear error under this Court's precedents  And that does not depend on what the State court may have decided about. Sotomayor, why do we bother saying in Williams that there are circumstances — I happen to think this is one of them — where, and you do too, where a State court hasn't reached an issue that we don't give a deference? Under your judgment, we made a mistake when we said that in Williams. No, Your Honor, because the — what this Court also said in Richter is that you look to the decision of the claim as a whole. You do not parse it into its components. And here, the decision on the claim as a whole was that no relief was warranted because any error did not rise to the level of a constitutional violation such that the defendant suffered sufficient harm to grant relief. So that is the decision that the — that resolves the claim, and that is the decision that resolves the claim. Sotomayor, why do we fight Aetba at all, meaning, I think we've said repeatedly that Brecht's actual prejudice standard is higher than the — the Aetba standard? So why are we applying it at all? Your Honor, if the Court were to proceed directly to the question of prejudice, then, yes, Brecht would be the standard that applies. However, before you even get to that question, the Court should look to what the State court did here first and determine whether that was reasonable. If it was unreasonable, or if there was no adjudication on the merits to begin with, then you reach the second question. Sotomayor, you've already admitted there's sort of an illogic when the State court says there was a Federal violation, but no harmlessness, and we say, yes, there was harm. No, Your Honor. I don't think there's an illogic. I actually think that the rule is all the more logical when you look to the fact that there is a decision denying relief. And that is the decision that is owed deference under Aetba standard, and that is the  Sotomayor, we don't give it deference that there was a Federal error. We don't say it was a reasonable mistake, but they found error and we accept the error. Correct, Your Honor, because what the State court may have thought about the underlying issue on de novo review is not controlling for purposes of Aetba. That is a different standard. I mean, would that — would that also apply? I'm just sort of trying to figure out the reach of this claim. Take a case where there was no harmlessness determination. There was just a single decision about a Batson claim, but it was an egregious decision. It was Hispanics aren't entitled to make Batson claims, something like that. Egregiously wrong. But I guess under your theory, we just look to the judgment and then we decide there is a credible way in which to say that this Batson claim was not a good one and that we should defer to that. Is that right? That's correct, Your Honor. If there is a denial of relief, then that is all the Federal habeas court needs to look to and then look backwards and ask whether there was a reasonable basis to support it. And that follows directly from this Court's decisions in Richter and Williams. There is no principled way to distinguish between where a State court does precisely that in silence and where the State court does it with a reasoned decision. We didn't do that in Wiggins, Rompel, or Porter, did we? No, Your Honor. Those are the ones that we have to overturn. And we have to overturn those cases to accept your proposition. The results in the cases would not have to be overturned. However, to be sure, this Court did apply a de novo standard of review to one prong of a multi-prong claim where the State court had not addressed, identical to this case. The State had not addressed one prong and we said de novo review. Correct, Your Honor. And those decisions, I would agree, cannot be reconciled with this Court's later decisions in Richter and in Tara Williams, which precisely address the issue of what do we do when the State court says nothing at all. We added the question whether or not the court of appeals properly applied the standard set forth in Breck. Do you want to address that briefly? And I think if we get into the details of this case, it seems to me that the key person is Orlander's. Yes, Your Honor. First of all, with respect to the question about Orlander's D. Well, I want to discuss this argument. Yes, Your Honor. Well, first of all, with respect to the standard that is to be applied in this case, the – this Court did make clear that it is the actual prejudice standard of Brecht that is to apply in virtually all 2254 cases. And that is to be the case regardless of whether the State court conducted a Chapman analysis. What the Ninth Circuit did here was take this Court's language and say that it could apply the Brecht standard without regard for the State court's very careful analysis in this case. Fry makes clear, though, that in order to give effect to AEDPA's purpose in limiting the availability of this extraordinary remedy and preserving the finality of State court judgments, the Brecht standard properly understood and applied is to be the most protective of final State court judgments. It is more protective than the AEDPA Chapman standard. It subsumes that standard. So what we were asking this Court to clarify in this case with respect to how a Federal habeas court is to apply the Brecht standard is that in a case such as this one where the State court has in fact conducted a Chapman analysis and found an error to be harmless, then the Federal court has to be able to fairly say that the State court's analysis is objectively unreasonable. If the Court cannot find the Chapman analysis objectively unreasonable, then the prejudice inquiry is at an end. And in this case, the Ninth Circuit misapplied the Brecht actual prejudice standard. The ---- Sotomayor, I'm having a bit of a hard time with this. Assume I accept your proposition that it's actual prejudice. In a process claim, generally, we don't talk about what the outcome was going to be. We talk about what the process was and whether there was an opportunity for you to make arguments you couldn't have made. All right? That's our normal jurisprudence in a due process claim. And we basically say you get a do-over because you weren't permitted to have the process you were entitled to. So you're saying we've got to treat this differently under Brecht. This person wasn't permitted to be there. I think there's some very convincing arguments, potentially, on at least one juror or landers. There, the comparison was not speculative. It was based on the answers provided by jurors who had both questionnaires and voir dire that was available. And the briefs point out, and so does the Ninth Circuit, very convincingly, all the excuses given by the prosecutor are rebutted by either identical answers by one juror, Anna, Anna or Anna, or other jurors who did exactly the same thing and were permitted to sit on the jury. So why are we doing anything different with this actual prejudice standard? Well, first of all, Your Honor, any time counsel is absented from a portion of the proceedings or any time a portion of the record winds up missing, it is often going to be the case that you might have had a very different record had those things been present. But the question before this Court on Federal habeas is whether the California Supreme Court believed that it had sufficient information before it from which to meaningfully address the issue on appeal. And with respect to Olander's D in this case, the prosecutor felt that Olander's D's answers were not particularly responsive to the question, to the questions being presented. The prosecutor's primary concern was with Olander's D's ability to vote for the death penalty. And the trial court conducted a meaningful inquiry with the prosecutor and gave a firsthand credibility determination. Sotomayor, don't talk to me generally. Anna L. said more equivocal things about the death penalty than Olander's D. So did another juror, and they still went on. Anna L. expressed that she had changed her mind about the views on the death penalty similar to the fact that Olander's D did. However, what Anna L. said was that she hadn't given it a great deal of thought until being called as a juror. And once she was called as a juror to sit on a – potentially on a death penalty case, she now sat down and considered the issue. And after careful thought and consideration, she believed that she, in fact, could make that decision if called upon to do it. Sotomayor, that's what Olander's D said, essentially. I would disagree with that, Your Honor. Olander's D specifically said on the death – on the questionnaire that he did not believe in the death penalty. So did she. But now called into voir dire, Olander's D could not provide the prosecutor with a satisfactory explanation for why his views had changed. He thought – I thought about it and realized I could. Olander's D's response at page 178 of the Joint Appendix, when specifically asked what caused the change, was, I mean, examining it more closely, I think, and becoming more familiar with the laws and the behavior, I mean the change in people, I think. That is a far – a significantly different response than somebody coming in and saying, this case caused me to think about it. And now that I have been forced to think about it, I believe that I can choose this as the penalty. Sotomayor, you see the two of them substantially different? One said, I thought, I've listened to what the law is, I've done – it's hard for me to imagine how they're substantively different. And do you think that defense counsel wouldn't have been able to point that out to the judge? And, you know, there were a lot of people questioned in this. How many days of voir dire was there? I believe it was three – three weeks of voir dire. Three weeks of voir dire. Do you suspect that the judge, or think that the judge, had clearly in mind every set of questions and the responses? Well, the California Supreme Court did credit this judge as being a very diligent, very well-respected judge. It's clear he was. I'm not doubting that. But my point is simply, do you think that pointing this out to the judge could not have had a substantial influence on his decision? Because all three prongs, he could have pointed to almost identical comments by other jurors. I would disagree that the comments would have been identical. I think that there are substantial differences between Olander's D's unconvincing answers and the very convincing answers of the other jurors. And in any event, what we look to is what the trial court and then subsequently the California Supreme Court had before it at the time that this decision was made. The trial court, as the prosecutor, while the prosecutor is making these race-neutral proffers, is — has the benefit of the questionnaire responses right in front of him. The trial court has all of the information in front of it from which it can make a credibility determination based on this record. There is no reason to believe that the trial court was considering anything less than all of the information available to it. And there is no reason to believe that defense counsel would have had any substantial impact in pointing things out that the trial court already had before it. The Ninth Circuit here, in its application of Brecht, demonstrated that it was not applying that standard in a manner consistent with this Court's opinions. Brecht speaks to actual prejudice. It does not speak to the kind of prejudice analysis like the Ninth Circuit did in this case, which was marred by speculation and hypothesis, where the court of appeals is hypothesizing about what a prospective juror might have been wearing or whether he was gathering prospective jurors for a social outing. The Ninth Circuit used a debatable set of inferences in this case to set aside the conclusion of the State court that a prospective juror's following a very controversial trial out of San Diego, where the very DA's office and police department that were investigating and trying Mr. Ayala's case were the subject of serious misconduct allegations, and suggesting that somehow a prosecutor basing his reasoning on that was a pretext for a racial discrimination challenge. The trial – the Ninth Circuit gave no credit to the trial court's firsthand observations in which the trial court found this prosecutor to be credible. And this was not a trial court that simply accepted the prosecutor's reasons at face value. This was a trial court that was discerning and critical of the prosecutor's reasons and even disagreed with him at times. And when you look, compare what the California Supreme Court did here, the California Supreme Court did it right. It credited the trial court's firsthand observations. It looked at the colloquy between the prosecutor and the trial judge and found support for each of those individuals' assertions in the record. The court was confident that the prosecutor had not exercised challenges based on race in this case. The State court analyzed the very same – Sotomayor's defense was to be confident. I mean, the whole purpose of an adversarial system is so that the other side of an argument is presented to the judge. Was he playing defense attorney, too? Is that – and defense attorney with the same purpose? Not literally, no, Your Honor. However, certainly the trial court must consider all of the information before it. And so it was looking at the very same things that defense counsel – Then why don't we just have a trial ex parte? I mean, presumably that's what you're arguing. I'm sorry? We should have the entire trial ex parte because the judge can do that. No, Your Honor. Certainly we would prefer that defense counsel – That the absence of counsel for this one incident was harmless. That's correct, Your Honor. You're not arguing for ex parte trials? No, Your Honor. I didn't think so. We certainly don't condone that approach here. And there is – we certainly don't condone that approach here. The – Anywhere else? No. No. We would certainly prefer that defense counsel be present. I guess my question is, the Ninth Circuit, at least with this juror – I'm not talking about the other things. I'm talking about this juror. As I pointed out earlier, pointed out to situations that were almost identical to the one that the prosecutor pointed to with this juror. Anna L. also said something that was totally nonresponsive to a question. It was like, that's correct, rather than answering the question. So you can say with complete confidence that that would never have made a difference to the judge. If he had had a real adversary able to point all of these things out, you're confident the judge would not have made up his mind. That's what you're saying. Based on the record in this case and what the trial judge had before him, and the fact that this was a critical trial judge, yes. I think the California Supreme Court had an ample record before it from which to conclude that defense counsel's presence would not have made a difference in this case. And I would go back to the other things. Sotomayor There's a real problem here, you do understand. We're only pointing to the things for which there was a record. There's another component to this, which is that all the other questionnaires and the entire transcript wasn't available. That is true, Your Honor. And certainly, any time counsel is absent or any time a portion of the record is missing, it will be the case that it is possible that the record might have been different. But what we should look to is what was left in the record. And what was left was a — was thousands of pages of a voir dire transcript. It was all of the questionnaires of the seated jurors, which are the most important ones for purposes of comparative analysis. And the first-hand observations of the jurors were not available. Scalia Is that standard, three weeks? Is that standard out there? Sotomayor It's a lengthy voir dire, Your Honor. Scalia Oh, my Lord. Sotomayor If I can reserve the remainder of my time. Roberts Thank you, counsel. Mr. Dean. Dean Mr. Chief Justice, and may it please the Court, let me start by answering the question that Justice Scalia, Justice Sotomayor, and Justice Kagan asked when this first began, and that is, yes, this was an adjudication on the merits based on the harmlessness determination. The reason the State wants to address the first prong in the first instance is because it wants to create the fiction that by treating this holistically, the California Supreme Court actually found no Federal error, and that is what this Court must grant deference to. So let's start with the second question. The second question is the question at heart. Was Brecht applied appropriately? And we only get to that in the general context if there was an unreasonable determination of Chapman by the State Supreme Court. And the Ninth Circuit said we grant deference on that point to the California Supreme Court. I'll address Olander's D, but let me even show you why this is case closed in an overarching pretext by the prosecutor that led to all the harm in this case. When the trial court asked the prosecutor to state his race-neutral reasons, the first words out of the prosecutor's mouth were pretext, active pretext, using a shield as a sword. The prosecutor said, and I quote, we can do that, but we will do it in chambers because they have no right, the defense, to our strategy. That was pretext. The prosecutor was stating on an overarching level for Olander's D, Galileo S, or the primary reason for challenge was strategy, and that was pretext. The trial court, which the State says we must give great deference to because it conducted credibility determinations, didn't question that. Defense counsel was primed to question that because defense counsel responded. But we have a right to be present, to hear that statement in case the prosecutor in question is misstating the facts. Alito, I don't really understand what you're saying. Maybe it was wrong to have this in camera, but why was the statement that we don't want to disclose our strategy a statement that the challenges that I'm going to make are going to be pretextual? Because when the prosecution said, I'll give you my reasons, but I don't want my adversary, I don't want my adversary to be present to test this in the crucible of an adversarial situation, which is what the Constitution requires. When he says, my reasons for challenging these jurors involve strategy, it's a pretext. It did not involve strategy. I don't understand that. When you're trying a case and you're deciding which jurors to exercise peremptory challenges against, do you not take into account what your defense is going to be, what your defense strategy in the case is going to be? You might, you might, but from George v. McCollum to in this case, the State court analyzed it under its own State law equivalent. Strategy is not why you would say, I don't like this person or I don't trust this person, he doesn't dress right, he doesn't fit in. The courts have said all of those are reasons for which the defense counsel can, should participate and respond. Strategy involves a much more deep analysis that is very rare, as this Court has said in prior cases, in the rare instance. It's very rare. This isn't a general argument that everything I do is strategy, but the prosecutor was saying it involves strategy, which is a very rare situation. And in none of, as the California Supreme Court recognized, none of his statements involve strategy. So at a minimum, the State says we must credit and give deference to not only the trial court, but the California Supreme Court's credibility determinations. If, as the California Supreme Court found in determining error, that it was not credible, that we, that strategy was not involved, then a credibility determination was not made. And furthermore, the trial court missed that. Defense counsel said, I don't want to be involved in their strategy, but I want to hear the statement, because I want to be present to tell you it's a misstatement. Why have we instruct our ---- Sotomayor, give an example of a strategy. The trial strategy might be I'm calling in, in the rare cases of this, might be calling an informant, and this informant might be living in the same neighborhood as this person, I don't want this person on there. Trial strategy might be that I'm going to be calling a witness who dresses in exactly the same way as that witness, and again, as a juror, I'm sorry. There could be very deep levels of that. But the California Supreme Court astutely recognized that was not the case. More importantly, it specifically, in opposition to Chief Justice George in dissent, said that the strategy, that the lack of strategy was error. What it didn't recognize, and this is why there was an unreasonable application of the statute. Alito, let me give you an example. Let's say your defense strategy is going to be that the police officers planted incriminating evidence, all right? And if that's going to be your defense strategy, will you not be particularly diligent in exercising your peremptory challenges to try to get rid of anybody who seems to have sympathy or an identification with the police? That's a strategy. It's not pretextual. There may not have been that here. The prosecutor may not have had a strategy like that. But I just don't understand this argument that you're making, that merely stating I don't want to disclose to my adversary what my trial strategy will be is a confession that I am going to exercise peremptory challenges pretextually, and I just don't want defense counsel there to call me on it. Well, let me take that from the beginning. The answer to your question is no, that's not a trial strategy in the context of the cases. Everything's a strategy. You could argue strategy is what order I'm going to call the witnesses in. The reason it's not a strategy and certainly not a reason for an ex parte communication is defense counsel would already know that. The witness would have been listed, discovery would have been given. That would have been in the police reports. So I want to be careful we don't confuse just the general strategy every attorney has in approaching a case with the question. Sotomayor, Prosecutors doesn't have to say it's because of planting of police. The prosecuting of evidence is going to be at issue. He could just say, I don't like people who distrust the police. He absolutely could, and that could be heard by the defendant. Actually, it's said quite often. It is a strategy, but that's not the trial strategy we're talking about, that in the rare instance, as this Court has said, would require an ex parte communication. Could you at the other side, I understand the idea that you're saying just, you know, basically you'd like jurors who are going to be sympathetic with your case, but you would say that's not a strategy. Well, what's the – what is a strategy, an example of that? No, and again, that's what I'm saying. Trial strategy isn't in the broad sense. Trial strategy is something that really is truly confidential. Like, I have – you could say in a domestic violence case, I have a witness that is afraid to testify, but may have some connection or knowledge. That person may know of the witness. I need to tell the judge that in camera and say, I can't take that risk. It could be a gang case where you have informants. It's a rare situation is what they're talking about. Well, even if the strategy was an overblown statement by the prosecutor, suppose that in this case the defense counsel is absent, but what the juror says is clearly grounds for the prosecutor to excuse. The juror says, I've thought about this, I can't – I don't believe in the death value, suppose that's a hypothetical, that's not the case. Of course. Then we still look to see whether or not there was harmless error. And I'm going to get to that. And it's true that the harmless error in this case loops back in your concern that there was not full cross-examination. They come together a bit. But it does seem to me that this district judge exercised care in listening to the answer. And we are required, the Federal courts are required under BRAC, to give very substantial deference to that finding. So if you could address that. And that's what I'm going to say. In addressing that, you do start with the premise that, as the California Supreme Court said, there was no strategy. So that's the pretext I'm talking about. If you start with that, that was missed by the trial court and only discussed in terms of error by the California Supreme Court, the California Supreme Court should have said in its harmless error analysis, I start with the reason defense counsel was excluded, was pretextual, whether, or was it false. It's false. Scalia. That goes to whether there was a violation, not to whether the violation was harmless or not. I disagree. And let me state why. The fact that you're assessing, as this State says, the credibility of the prosecution's reasons. If the prosecution starts with a reason that is false, saying, I don't even want my adversary in the room. And he didn't say it like, Your Honor, I have concerns, can I discuss them? He said, we'll do it, but not in their presence. The State caused the removal of defense counsel. And if we just take Olander's, Olander's D, Anna L. not only had questions she responded to virtually identical, she actually said she would be a holdout. She made a statement, if the other jurors voted for death, I might not. In fact, she said, I would not. Olander's D. I mean, you're looking at, and we've said this often in Batson-type cases, you're looking at a cold transcript. You don't know what the difference in intonation was. You don't know if Olander's is saying, well, you know, I thought about it and blah, blah, blah, blah. And the other one is saying, I thought about it about this trial and now. I mean, you know, we don't know that. But that serves our purpose. That serves our purpose, because what we didn't have is the adversarial crucible. We didn't have defense counsel saying exactly what you said. Oh, wait a minute. Kennedy, you've got to be kidding me. Kennedy, you've got to be kidding me. Suppose the defense counsel were present and the transcript said exactly what it says here. Defense counsel made no objection. It seems to me that that's how you have to analyze this case, because we're assuming no error. Now, I understand that it would have been a much better record if the counsel were there. That's the reason why there's a likely error here under a matter of law. But we're talking about the harmlessness, the deference that must be given to the State judge. Absolutely. And the deference under Brett, and I would even say under Richter, requires a fair and balanced playing field. At least you have to start. Every case from Felkner, every case that has addressed Batson has had a level playing field. All the participants have contributed. And there was a complete record. But the reason I'm saying this is prejudice is it was the State that actively corrupted the record. The State excluded the defendant. So now the State turns around and says, well, you're speculating. It caused the need to speculate. And what I'm saying is if the California Supreme Court had taken into account in its prejudice analysis that it was the State, through a pretext, that excluded the defendant, we wouldn't have to speculate. We wouldn't have what is a corrupt record. Sotomayor Well, we're speculating the judge would not – that the defense attorney remains silent or that the defense attorney – either way. Sotomayor We would be speculating if the defense attorney remains silent, or we would be speculating that the judge would have ruled the same way. The question is on this record. Had he ruled the same way, had defense counsel participated, he ruled the same way, we would have had a Batson challenge in substance, not, as Your Honor has recognized, a procedural issue. At that point, all this Court has said all we can do is say would it have likely changed the outcome. We can't speculate either way. But the problem is it's the State that caused that, and that's the prejudice. The State caused the inability to have a complete record. Actually, in two ways. It also lost inadvertently in that instance. It lost the Miller L. v. Dredge opportunity through the questionnaires. But the State actively caused the exclusion of the defendant. It caused the inability to have a complete record. And that's different from merely saying that there was an ex parte proceeding, but we followed it up. Kennedy Well, I'll go back and look at this. I did not think that this was really the basis for the Ninth Circuit's conclusion that O'Lander's testimony showed that he was improperly excused. I just don't see it. I mean, it's a long opinion, but page 678, it talks about O'Lander's just in the term that we're talking about. Verrilli, It said the prosecutor had said that he was not responsive. The Ninth Circuit, to address your question, Justice Kennedy, the Ninth Circuit said that in its review of the existing transcript, he was very responsive. So there was a disagreement there. The Court disagreed with the statement that he wouldn't fit in. The Court said, I believe he would fit in with the rest of the jury. Sotomayor Well, the trial court said that. Verrilli, I'm sorry, but the Ninth Circuit pointed out the trial court said that. So the reason O'Lander's D is so compelling is because the trial court itself questioned some of the prosecutor's reasons, but there were others. For instance, the prosecutor said the questionnaire indicated he opposed the death penalty. We actually don't have questionnaires because they're gone. We have to take it at its word that it did. Defense counsel, again, had the prosecutor not proactively excluded him, might have said, well, the questionnaire said A, B, C. We might have had a complete record. Sotomayor That's speculation. What the Ninth Circuit did with O'Lander's B is point to the actual existing record. And show that there were contradictions to end the record as it existed. Verrilli, And that's what our argument. You can even take the existing record and show the inconsistencies. It showed Chapman was not appropriately appropriate. Alito But of course it's speculative that defense counsel, had defense counsel been present, would have been able to point to the other juror, Anna. We've had a number of cases where defense counsel was present at the voir dire, which I think should be the rule in almost every situation. And only later, years later, on appeal, particularly when you have many, many jurors question this, apparently was the case here, does somebody realize, well, this juror who was dismissed has answers that seem to be somewhat similar to this other juror who wasn't challenged. And then had that been the facts, we lose. Under AEDPA, we lose. Because you do have to give deference under AEDPA to the California Supreme Court. I agree. But what reason is there to think that defense counsel would have had a better recall of this than the trial judge who was there? Defense counsel, first of all, there were two of them. First of all, they're more focused on each of the jurors that were excused. The judge had, as the Ninth Circuit noted, there were 70 questions for each of these questionnaires. They involved 17 pages. The judge had to take — he may have had his own notes that he thought were important. They may have been complete or not incomplete. A judge certainly has many more tasks that don't involve just the direct advocacy as defense counsel has. But that's when I add, it's the prosecution, the State, that caused that, and then uses its sword to say, well, now you're speculating. We can do nothing more, but with Olander's D on the existing record, we can show that was wrong. The reason I'm saying it was unreasonable is because the Court should have taken into account in prejudice that there is a lack of credibility when a prosecutor comes in and causes all these problems, and the State supreme court says, and that wasn't correct, there was no strategy involved here. By the way, they use — the courts use the term strategy and confidential information. Those are generally tied. They're used where you have informants. They're used where you have gang activity. Very rare circumstances that occurs. But how — even if you've said under Richter, how can any reasonable judge or justice disagree that if the State, through a false basis, excluded defense counsel, eliminated defense counsel from challenging the questions and assisting the judge, where the judge didn't recognize that strategy was not involved, prevented further voir dire, which might have corrected the situation, prevented a proper record, and then later lost all of the ability to do a comparative analysis, could be harmless And let me even use in the Brex standard, this Court has eloquently said that — and if you'll give me a moment of unprofessionality while I shuffle my pages — but this Court has said that it undermines the very integrity of the court system. And in McCollum, it actually described that it's — it may be obvious to the jury, it undermines the party's understanding and the court's ability to maintain integrity through the entire trial. So under Brecht, this error caused injury to the jury verdict. And moreover, the questionnaires are lost. Even Brecht can't address that because they were lost post-verdict. But under any standard, there was an unreasonable application of Chapman by the State Supreme Court, and it had actual prejudice in this case. Justice George, in his dissent, was correct. How can anybody credit this record? It wasn't accidental. It wasn't as though defense counsel were arguing defense counsel was ineffective. The State caused this. And it didn't cause it through inadvertence. It actively insisted that it would do this only in chambers, in camera. And going back to Cronick and going back to Wade, this was a critical portion. Forget ex parte. There are many times you can do ex parte proceedings if you make a proper record. They're all rare, but there are times you can do them. But in this instance, in the critical bats and phase to exclude the defendants, I use pretext, it's a false statement that the prosecutor gave that it was strategy. That's prejudicial. It's prejudicial under Brecht, and it's certainly prejudicial under Richter. Thank you, Your Honor. Kennedy. It doesn't relate to the issues you've been arguing. This crime was, what, 30 years ago in the trial, 26 years ago? 1996. Yeah, very close. Has he spent time in solitary confinement, and if so, how much? He has spent his entire time in what's called administrative segregation. When I visit him, I visit him through glass and wire. Is that a single cell? It is a single cell. They're all single cells. While San Quentin is on the most — it's on heaven's land in Marin County. It's a 150-year-old prison, and their administrative segregation is single cells, a very old system, very small, and not allowed. Is it the same thing as solitary confinement? No, it's 23 hours out of the day. That probably is the same. They generally — administrative segregation, you're not allowed in the general yard anymore. But you are allowed an hour a day. One hour. Effectively. Thank you, counsel. Thank you, Your Honor. Four minutes. Ms. Urbanski. Thank you, Mr. Chief Justice. Just a few brief points. First of all, with respect to the prosecutor stating that he believed he would reveal trial strategy, there is no reason to think that that was any kind of a pretext for then exercising peremptory challenges on the basis of race. The trial court never found this prosecutor to be anything less than credible, and that determination is entitled to great deference in a Federal habeas collateral proceeding. With respect to O'Lander's deed to the trial court, what was the trial strategy that displayed itself in his strikes? I cannot tell the Court what it was, but I don't think there is any reason to take the prosecutor at anything less than his word. We don't have anything in the record to refute it. Certainly, that is not what ended up happening, but it is also not a reason to suggest that this was a pretext for race. With respect to O'Lander's deed, this juror gave responses that were not only not credible, but they were not credible enough for any prosecutor to have doubt about that particular juror serving on a capital case. There were clearly grounds for the prosecutor to have wanted to excuse that juror. But most importantly, the California Supreme Court looked at this record and it found support for the assertions in the record. With respect to O'Lander's deed, that appears at Petition Appendix page 203a. What we have here is the Ninth Circuit substituting its own view without ever showing how the State court was objectively unreasonable in its analysis. We have a State court here that analyzed the very same harmlessness question under a much higher standard, the Chapman standard, and found no harm. And to proceed without regard for the State court's very careful determination in that regard seems antithetical to the spirit of AEDPA. Thank you. Thank you, Counsel. The case is submitted.